2001 OK 42

STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Howard ISRAEL, Respondent.

No. SCBD 4524.

Supreme Court of Oklahoma.

May 15, 2001.

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Robert W. Raftery, Oklahoma City, OK, for Respondent.

## BAR DISCIPLINARY PROCEEDING.

### HODGES, J.

¶ 1 This bar disciplinary proceeding examines ethical issues surrounding Respondent's representation of a client in a paternity and child support proceeding while a corporation in which Respondent was a shareholder contracted with the client for collection of child support. This proceeding also examines Respondent's management of client funds and a lawyer's duty to withdraw from representation when discharged by the client. Following an extensive review of the factual allegations and the evidence presented, this Court finds that Count III of the complaint has been proven by clear and convincing evidence. Public censure is imposed as the appropriate discipline.

### FACTS

¶ 2 In April, 1994, Howard Israel (Respondent) and Barbara O'Berg, a non-lawyer, incorporated Child Support Services, Inc. (CSS). The purpose of CSS was to help single mothers with children collect court-ordered child support. Respondent and O'Berg were each 50 per cent shareholders. Respondent drafted the documents and forms used by CSS and served as its service agent. At the same time, he would contract separately, as a lawyer, to obtain a support order for the client and establish paternity if necessary. O'Berg's duties were to market CSS, answer the telephone, interview prospective clients, take information and perform general clerical duties.

¶ 3 On August 10, 1994, Stacy Renne executed an agreement with CSS for child support collection. It provided:

### AGREEMENT

I hereby retain Child Support Services of Oklahoma, Inc. ("CSS") to represent me, Stacy Renne', for child support collection.

I agree to pay said fees as follows:

$25.00 non-refundable Application Fee; and

25% of all monies collected.

I further agree that all court costs, subpoena costs, photocopies, photos, depositions, court reporter costs, and all other out-of-pocket expenses shall be advanced by CSS but will be ultimately paid by Client. Client will advance Blood Test costs only if ordered to do so by the court.

The fees enumerated above include all trial court proceedings but do not include appeal from an adverse ruling of the trial court. In the event an appeal should become necessary in this matter, such services will be contracted separately.

It is agreed that Howard F. Israel, attorney at law, working in conjunction with CSS, will appear on my behalf or undertake my legal representation in this matter.

I further agree that CSS makes no warranties regarding the successful collection of any monies for child support. No representation is made by CSS that any contribution by the other party will be obtained towards the Client's legal fees or costs. In the event, however, that such a contribution is obtained, that amount will be credited toward any fees and costs owed. If none is owed, the amount will be delivered to Client.

I hereby authorize all child support payments to be made directly to CSS. In the event CSS has not been paid in full for fees which are due it under this agreement at the time any child support is paid to me as a result of the services rendered in this action, I hereby grant CSS a lien and agree that CSS may deduct all fees due it from any child support paid to it on my behalf before paying the balance to me.

If at any time CSS determines, in its sole discretion, that child support is uncollectible, it may cease collection efforts and terminate its obligations under this Agreement. If such a decision is made and communicated in writing to the Client then NO FEES OR EXPENSES are due to CSS.

If the Client terminates this Agreement at any time prior to successful completion by CSS, then Client agrees that it owes to CSS the benefit of its bargain which is the fees CSS could have collected and the lien and assignment of Child Support shall not be terminated.

The above agreement is hereby accepted on the terms stated. CSS agrees to make no charge for services unless recovery is had in this matter. In addition, CSS agrees to make no settlement without the consent of the Client.

The same day, Renne executed a fee agreement whereby she retained Respondent to establish paternity of her minor child and obtain a child support order. It provided:

*FEE AGREEMENT FOR HOURLY FEE*

I, Stacy Renne', of Oklahoma City, Oklahoma, the "Client", hereby agree to retain the law firm of Howard F. Israel, P.C., the "Firm", in connection with establishing paternity of my minor child/children.

1. The Firm upon receipt of a fully signed copy of this Agreement, agrees to represent Client in connection with this matter.

2. The Firm will bill the Client monthly on a time-expended basis at the hourly rate of $125.00 per billable hour. The Firm agrees to be compensated from future child support collections. The Client agrees, that Child Support Services of Oklahoma, Inc. may deduct the full amount of the Firm's fees from child support collections, not to exceed 25% of any amount collected.

3. It is impossible to determine in advance the amount of time that will be needed to complete Client's matter. Any time spent relative to the Client's matter, including conferences, telephone calls, drafting documents, research, necessary travel time, etc. will be billed on an hourly basis. Time will be billed in multiples of 10ths of an hour. A minimum of 2/10ths of an hour shall be billed for each action performed.

4. Over the years, the Firm has spent countless hours developing agreements, forms and documents. The value of these to the Client cannot be measured merely by the time it may take to adapt them to the Client's case. Therefore, if one of these documents is used in the Client's matter, the Client will be billed at an institutional rate, plus the time taken to adapt it to the Client's matter.

5. The Client agrees to assume and pay for all out-of-pocket costs incurred in connection with this matter (e.g., sheriff's fees, filing fees, witness fees, travel, expenses of deposition, investigative expenses, copying, long distance telephone charges, extraordinary postage and other incidental expenses). All expenses will be advanced by the Firm **EXCEPT FOR** costs of any blood test.

6. To the extent of any fees and costs due to the Firm pursuant to this Agreement, Client hereby assigns to the Firm any and all funds and property due to, or received for the benefit of, the Client arising out of the subject matter of this representation.

7. No representation is made that any contribution by the other party will be obtained toward the Client's legal fees or costs. In the event, however, that such a contribution is obtained for the benefit of Client, the amount in question will be credited against any fees and costs owed. If none are owed, the amount will be delivered to the Client.

8. It is further understood · that this Agreement provides for services through trial on the merits of the case. It does **not** provide for an appeal, if any, from the trial court or for any subsequent proceedings for enforcement of the judgment or advice or consultation or proceedings subsequent to the judgment. The Firm may cease representation of the Client at any time and within its sole discretion.

9. Every effort will be made to expedite Client's matter promptly and efficiently according to the highest level and ethical standards.

Thus, Respondent was to receive 25 per cent of each child support payment to be applied to his fees until paid. CSS would also retain 25 per cent of each payment collected during the time the child support order was in effect. Respondent, as a 50 per cent shareholder, would receive half of CSS's 25 per cent. Respondent explained the arrangement in a meeting with Renne and O'Berg before the contracts were executed. Respondent would later testify, as would O'Berg, that Renne was told Respondent and O'Berg were "partners" in CSS. Renne would later maintain that she was not made aware of this fact until 1998, when so informed by the lawyer who wrote to the Bar Association on her behalf.

¶ 4 On June 13, 1995, Respondent obtained an order from the District Court of Oklahoma County ordering Jeffrey Taylor to make child support payments. Pursuant to the agreement between the parties and incorporated into the order, was a provision that all payments should be "made payable to Howard Israel, P.C." and be mailed to his office address. In September, 1995, Taylor began making the court-ordered child support payments. Respondent would send Renne a check attributable to each month's payment from Taylor along with an accounting of the amount applied to Respondent's legal fees and the payment to CSS.

¶ 5 Soon after Taylor began making the court-ordered payments, Renne began to make repeated inquiries concerning the contracts and complained about the speed at which payments were received. She was also dissatisfied with Respondent's unwillingness to immediately initiate contempt proceedings when payments from Taylor became overdue. Respondent would communicate with Renne, on average, once a week by phone and once a month by letter.

¶ 6 By the spring on early summer of 1995, O'Berg quit performing any CSS functions and Respondent took over those duties. The corporation was suspended by the Oklahoma Secretary of State for failure to comply with franchise fee requirements. At the time of trial of this matter, Respondent was still sending O'Berg her fifty percent share of CSS fees.

¶ 7 Child support payments from Taylor had been erratic and required continued intervention. But Respondent received no payments from Taylor for the months of January, February, and March, 1998. Taylor told Respondent that he had mailed the payments directly to Renne at her request. Taylor would later testify that, in late 1997 or early 1998, Renne told him that Respondent was not forwarding the payments to her and that she had fired him. Taylor also testified that he sent the January, February, and March payments directly to Renne, although he could not produce any supporting documentation. Respondent testified that in a telephone conversation, Renne did not confirm nor deny receiving payments directly from Taylor and that he took her silence as an admission that she had. Respondent retained the amounts owed to him and to CSS from later checks from Taylor. He forwarded the remainder to Renne along with an accounting.

¶ 8 By April, 1998, Renne had decided she no longer desired Respondent's services. She consulted another lawyer who wrote to the Bar Association. The letter dated August 18, 1998, included copies of Renne's contracts with Respondent and CSS, and copies of pleadings, ledgers and checks. Also included was Renne's "Notes of Concern" which voiced her complaints concerning Respondent. It concluded with the question: "Can I fire my attorney?" Respondent answered the grievance in a letter to the General Counsel's office dated October 5, 1998.

¶ 9 At that time, Taylor was again behind in child support payments. Respondent proceeded with a contempt citation with what he believed to be Renne's knowledge. The application was filed on October 29, 1998. Respondent received a handwritten note from Renne dated November 5, 1998, which stated: "Effective immediately, your services are no longer required!" Afterwards, Respondent continued to pursue what he perceived to be his statutory and contractual lien rights

by prosecuting the contempt citation against Taylor.

¶ 10 Respondent's attempt to continue to prosecute the action in Renne's name resulted in dismissal, sanctions, and the trial court's directive that Taylor pay child support payments directly to Renne. The Court of Civil Appeals affirmed the order dismissing the contempt action against Taylor, but it remanded the issue of sanctions for further proceedings. Certiorari review of the Court of Civil Appeals' opinion was not sought. Mandate issued on September 25, 2000.

¶ 11 The Bar filed a three-count complaint against Respondent on February 28, 2000. Count I alleged that Respondent's representation of Renne while he held an interest in CSS violated Rules 1.7(b) (representation materially limited by lawyer's own interest), 1.8(a) (business interest adverse to client), 5.4(b) (partnership with a nonlawyer), and 5.4(d) (nonlawyer interest in lawyer's practice) of the Rules of Professional Conduct, Okla. Stat. tit. 5, ch. 1, app. 3–A (1991). The Rule 5.4(d) allegation was withdrawn prior to trial of the complaint. Count II concerned Respondent's withholding of attorney fees and CSS collection fees attributable to the January, February, and March, 1998, payments which Taylor testified were made directly to Renne. This was alleged to have violated Rules 1.1 (duty to provide competent representation), 1.4 (communication with client), 1.7(b) (representation materially limited by lawyer's own interest), 1.15(b) (duty to promptly notify client of funds received and render a full accounting), and 1.15(c) (disputed funds to be kept separate until dispute with client resolved). Count III addressed Respondent's pursuit of the contempt action against Taylor after he received notice that Renne had fired him. This count alleged a violation of Rule 1.16(a)(5) (lawyer must withdraw from representation when discharged).

¶ 12 A trial panel of the Professional Responsibility Tribunal (PRT) heard this matter and recommended that Respondent be suspended for thirty days. On Count I, the trial panel found a conflict of interest which required Respondent to disclose in writing the percentage of his interest in CSS. As to Count II, the trial panel found that Respondent had failed to give notice and adequately account for the fees and CSS payments attributable to the three payments which Taylor told Respondent he had paid directly to Renne. Concerning Count III, the trial panel determined that Respondent had continued to maintain the contempt action against Taylor after he had been discharged by Renne.

■■■ ¶ 13 In a bar disciplinary proceeding, this Court exercises its original jurisdiction and conducts a *de novo* review of the record. *State ex rel. Oklahoma Bar Ass'n v. Andre,* 1998 OK 29, 957 P.2d 545, 547. "The PRT's findings of fact and conclusions of law are neither binding on this court nor do they carry a presumption of correctness." *State ex rel. Oklahoma Bar Ass'n v. Colston,* 777 P.2d 920, 923 (Okla.1989). "To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence. . . ." Okla. Stat. tit. 5, ch. 1, app. 1–A, Rule 6.12(c) (1991).

## COUNT I

### Conflict of Interest

■■ ¶ 14 The Bar maintains that Respondent's interest in CSS materially limited his representation of Renne under Rule 1.7(b) [1] such that Respondent should not have represented her. The Bar further maintains that, before undertaking representation of Renne, Respondent was required by Rule 1.8(a) [2] (3)

---

**1.** A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interest, unless:
　(1) the lawyer reasonably believes the representation will not be adversely affected; and
　(2) the client consents after consultation. When representation of multiple clients in a sin-

gle matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantage and risks involved.

**2.** A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

the client consents in writing thereto. to disclose in writing that his interest in CSS was fifty percent. Respondent counters that there was no adverse interest requiring such written disclosure and that his oral disclosure that he and O'Berg were partners in CSS was sufficient.

¶ 15 "An attorney must be able to advocate his client's cause untrammeled by a conflicting loyalty to another.... Conflict rules are designed to protect a client from a lawyer unable to undertake effective advocacy because of loyalty to some adverse or conflicting interest." *Andre,* 957 P.2d at 548. The issue becomes whether Respondent's business interest in CSS was adverse to his representation of Renne.

¶ 16 The interests of Respondent, O'Berg, and Renne were the collection of child support payments from Taylor. Thus, the interests of respondent and Renne were not adverse. If Respondent's representation failed to result in a child support order, there would be no payments for CSS to collect and distribute. In addition, Respondent would receive no payment for his legal services.

¶ 17 This matter does not present the situation found in *State ex rel. Oklahoma Bar Ass'n v. Halley,* 781 P.2d 833 (Okla.1989). There a lawyer was disciplined for failing to disclose that he held any interest in a company which performed title examinations for his clients.[3] The fee for the examination was charged as an expense and was not disclosed to clients. Thus, not only was the lawyer's business interest undisclosed but so was the fee that was charged to the client.

¶ 18 Here, there was evidence presented, and the trial panel found, that Respondent disclosed to Renne that he and O'Berg were "partners" in CSS when the three met for one to two hours to discuss the arrangement. Following the meeting, the contracts were given to Renne for her study and signature.

They disclosed the fee CSS was to receive for its collection efforts. The Bar has not demonstrated by clear and convincing evidence that Respondent failed to disclose that he held an interest in CSS.

¶ 19 A word of warning to lawyers is in order. In any business association with a client, written disclosure of a lawyer's interest is certainly the safest course. Written disclosure in this matter would have eliminated any question concerning what the client was told.

### Partnership with Nonlawyer

■ ¶ 20 Rule 5.4(b) prohibits partnership with a nonlawyer "if any of the activities of the partnership consist of the practice of law." The Bar maintains that Respondent's partnership with O'Berg, a nonlawyer, in CSS violates that provision. As the trial tribunal correctly concluded, however, it does not.

¶ 21 The record demonstrates that CSS was a collection agency designed to handle the ministerial functions involved in collecting and distributing child support payments. All legal matters were referred to Respondent's law firm as provided in the contracts with Renne. No evidence was presented to indicate that O'Berg had done, or intended to do, anything which could be construed to be the practice of law. No violation of Rule 5.4(b) has been demonstrated.

### COUNT II

¶ 22 The violations alleged in Count II concern payments from Taylor alleged to have been made directly to Renne for the months of January, February, and March, 1998. Respondent withheld the agreed amounts of attorney fees and CSS fees for those months from the April, May, and June payments made on April 20, June 1, and

---

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

3. As the comment to Rule 1.7 notes: "A lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest."

June 19, 1998, respectively. He also withheld the April, May, and June amounts from those checks. On July 8, 1998, Respondent forwarded the remainder of the payments to Renne with a ledger accounting of the distribution.

¶ 23 The Bar asserts that Respondent's actions violated his duty to keep his client reasonably informed concerning a matter [4] and, more specifically, his duty to inform a client concerning funds received in which the client has an interest.[5] Further, the Bar maintains Respondent violated his duty to keep disputed funds separate until the dispute is resolved.[6]

¶ 24 The critical issue at trial was whether Renne had disputed the matter with Respondent before the distribution and accounting was made, such that the funds should have been kept separate until the dispute was resolved. As the trial panel concluded: "It appeared that Respondent did attempt to inform his client, and she did not complain until after the fact." This Court's *de novo* examination of the record confirms that conclusion. Therefore, this Court finds that the factual allegations supporting these violations were not established by clear and convincing evidence.

¶ 25 The two other grounds alleged as misconduct in Count II must also be rejected. There was no evidence that Respondent

4. Rule 1.4(a) provides: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information".

5. Rule 1.15(b) requires:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

6. Under Rule 1.15(c):

When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of

failed to provide competent representation as required by Rule 1.1.[7] In rejecting this assertion, the trial panel found that "Respondent did an excellent job of obtaining the paternity action judgment and establishing child support payments, though they may have been sporadic and occasionally not timely." The conflict of interest allegation must be rejected for the reasons stated in this Court's analysis of Count I.

## COUNT III

■ ¶ 26 Count III alleges a violation of Rule 1.16(a)(5) [8] which requires a lawyer to withdraw from representation of a client if the lawyer is discharged. Respondent failed to meet this duty. After being discharged, effective November 5, 1998, Respondent continued to prosecute a contempt citation against Taylor in the name of Stacy Renne.

¶ 27 No matter how sincere Respondent's belief that he could continue to prosecute the claim to protect his lien rights and enforce the agreements with Renne, he was not relieved of his duty to withdraw from representation when discharged. Respondent was required to first withdraw and then decide whether to proceed in his own name against his former client.[9]

## APPROPRIATE DISCIPLINE

■ ¶ 28 The Trial Panel has recommended that Respondent be suspended from

their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

7. "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for representation."

8. "Except as stated in paragraph (c), a lawyer shall not represent a client, or where representation has commenced, shall withdraw from the representation of a client if: ... (5) the lawyer is discharged."

9. As the comment to Rule 1.16 notes: "A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment of the lawyer's services. Where future dispute about the withdrawal may be anticipated, it may be advisable to prepare a written statement reciting the circumstances."

the practice of law for a period not to exceed thirty days. That recommendation, however, was based in part on violations which were not established. In addition, several factors mitigate any discipline to be imposed.

¶ 29 Since his admission in 1976, Respondent has never been disciplined by the Professional Responsibility Commission or by this Court. Testimony was offered that Respondent is a conscientious, meticulous, and diligent lawyer. He has served as a volunteer member of Legal Aid's Pro Bono Panel of lawyers for over sixteen years, paying court costs out of his own pocket. He was named 1986 Pro Bono Attorney of the Year by Legal Aid of Western Oklahoma. In addition, Respondent cooperated with the office of General Counsel in the investigation and prosecution of the complaint. Also, there was no indication that the client was harmed by Respondent's representation. This Court finds that public censure is the appropriate discipline to be imposed.

## COSTS TO BE IMPOSED

■ ¶ 30 The Bar has asked this Court to assess costs totaling $2,370.36. Of that amount, $2,054.50 represents transcript expenses. Respondent has objected to $859.50 of the requested transcript expenses as beyond that allowed by title 20, section 106.4(b) of the Oklahoma Statutes. That section provides:

> Upon request of either party in a civil or criminal case the reporter shall transcribe the proceeding, in a trial or other judicial proceeding, or so much as may be requested by the party, certify to the correctness of the transcript, and deliver the same in accordance with the rules of the Supreme Court. The fee for an original transcript shall be Two Dollars and fifty cents ($2.50) per page. Two copies of the original transcript shall be furnished without additional charge....

Respondent argues that this provision limits the amount of costs for transcription of a bar disciplinary proceeding to $2.50 per page.

¶ 31 Section 106.4 applies to "official court reporters". The $2.50 per page is in addition to the salary and benefits they are paid by the state. See Okla. Stat. tit. 20 § 106.9 (Supp.2000). The statute does not apply to freelance court reporters such as those utilized in this bar disciplinary proceeding. However, a reduction of the costs to be assessed against Respondent is appropriate for another reason.

■ ¶ 32 Of the numerous allegations in the three-count complaint, the Bar proved only one by clear and convincing evidence. Rule 6.16 of the Rules Governing Disciplinary Proceedings, Okla. Stat. tit. 5, ch.1, app. 1–A (1991), provides that "[w]here discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown." Costs to be assessed against Respondent are therefore reduced to $790.12, to be paid within ninety days of the effective date of this opinion.

## RESPONDENT PUBLICLY CENSURED AND ASSESSED COSTS OF PROCEEDINGS

¶ 33 HARGRAVE, C.J., WATT, V.C.J., LAVENDER, SUMMERS, BOUDREAU, WINCHESTER, JJ., concur.

¶ 34 OPALA, J., with whom KAUGER, J., joins, dissent.

OPALA, J., with whom KAUGER, J., joins, dissent.

¶ 1 I would impose that discipline which is recommended by the PRT panel.