2000 OK 88

**STATE of Oklahoma, ex rel. OKLA-HOMA BAR ASSOCIATION,**
Complainant,

v.

**Frederick Warren SOUTHERN,**
Respondent.

**No. SCBD–4491.**

Supreme Court of Oklahoma.

Nov. 7, 2000.

Loraine D. Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Donald W. Davis, Oklahoma City, OK, for Respondent.

BOUDREAU, J.

¶ 1 The Oklahoma Bar Association brought Rule 6 disciplinary proceedings against Respondent attorney, Frederick Southern, in a Complaint and Amended Complaint alleging a collective total of five counts of misconduct relating to the neglect of five clients in Respondent's charge.

¶ 2 The Professional Responsibility Tribunal held a hearing on April 26, 2000. The Tribunal recommended Respondent receive a private reprimand with a period of probation. The terms of probation included the advice and assistance of Lawyers Helping Lawyers, an assessment by the bar association's law office management services, continued good standing in the bar with no disciplinary action during the probationary period, and regular counseling with medical supervision. While the bar association agreed with the Tribunal's recommendation of probation and its conditions, it requested a public censure instead of a private reprimand.

¶ 3 The five counts alleged against Respondent are similar, each consisting of client complaints for neglect of their respective cases. The bulk of Respondent's misconduct occurred in 1997 and 1998. The client neglect took the form of failing to return phone calls, failing to work the files and in general failing to handle the cases with competence and diligence. The bar also alleged that Respondent repeatedly failed to respond to the bar association when it contacted him about the client complaints.

¶ 4 At the time Respondent was failing to care for his clients, he suffered from an illness which completely destroys the body's ability to produce or store vitamin B–12. The illness caused Respondent to experience severe short-term memory lapses, erratic behavior and general physical illness, accompanied by weakness and fatigue. The B–12 illness exacerbated Respondent's already depressed state, caused by deaths in his immediate family. Respondent's illness was so severe he was eventually hospitalized. Ultimately, several biopsies in 1999 revealed Respondent suffered from the B–12 deficiency illness. Prior to the diagnosis, Respondent sought treatment and counseling for depression with only marginal success, as the B–12 illness was the primary factor in his behavior. After receiving treatment and regular B–12 injections, Respondent began timely and effectively responding to the bar's requests.

¶ 5 For the reasons set out in this opinion, this Court imposes a public censure accompanied by a period of probation and conditions in keeping with those outlined by the Tribunal and bar association.[1] With regard to

1. The parties agreed to the following probationary terms in conjunction with Respondent's discipline:
   a) That Respondent will seek the advice and assistance of the Lawyers Helping Lawyers program and obtain a sponsor, therein;

   b) that Respondent will, if ordered by the Oklahoma Supreme Court, submit to an assessment by the Law Office Management, of the Oklahoma Bar Association, concerning Respondent's office and procedures for handling cases and clients and that Respondent will abide by

part "b" this Court will order the Law Office Management assessment stipulated to by the parties. However, we alter the conditions of probation (with regard to part "d") to require Respondent to take all necessary measures to control his depression and his vitamin deficiency illness, but not to require Respondent to seek the counsel of his minister unless he so desires.

¶ 6 Normally, the serious nature of each of these complaints and the volume of client neglect would warrant some period of suspension. However, Respondent presented compelling evidence in mitigation of a more stringent punishment. Both he and his doctor offered evidence describing an undiagnosed physical illness, exacerbated by classical symptoms of depression. The testimony clearly persuaded the Tribunal that Respondent's failure to properly tend to these five clients and timely respond to the bar inquiries was primarily the result of his medical condition, rather than willful or conscience neglect. As an additional mitigating factor, in his seventeen years of practice Respondent has received no previous discipline.

¶ 7 While this Court agrees with the Tribunal that Respondent presented compelling mitigation evidence, we recede from the Tribunal's recommendation in one significant respect. The testimony at the hearing indicated Respondent knew he was in deteriorating health and his condition impaired his ability to represent his clients in a competent manner. Although Respondent took steps to compensate for his loss of short term memory, he soon became aware through a rash of client complaints that the measures were not adequate. At that point, he should have terminated his services as the clients requested or sought outside assistance. Having failed to protect his clients when he understood that he was no longer able to adequately represent them, this Court imposes a public censure.

### I. Green Complaint

¶ 8 Respondent and the Oklahoma Bar Association entered into agreed stipulations and findings of fact with regard to the five client complaints. The first complaint was brought by James Green (Green), who retained Respondent to assist him in his slander suit against Norman Motors. Green employed Respondent in November 1995 and experienced difficulty communicating with Respondent throughout the entire course of the representation.

¶ 9 The communication problem between Green and Respondent reached its worst point between August of 1997 through the filing of this complaint in October of 1998. Green apparently believed that his lawsuit had not yet been filed (Respondent filed the suit in July 1997, but failed to communicate the fact to his client). During this period, Green continually contacted Respondent expressing concern relating to the running of the statute of limitations. In a three month period between December 1997 and February 1998, Green wrote Respondent on three separate occasions requesting that Respondent mail him a copy of the filed lawsuit. According to Green, Respondent failed to respond to any of these inquiries.

¶ 10 Green tried unsuccessfully to reach Respondent on many occasions in the subsequent months. In August 1998, Green once again wrote Respondent and advised Respondent that after sending over fifty faxes and phone calls to which he received no response, he intended to contact the Oklahoma Bar Association and file a grievance against Respondent.

¶ 11 Upon receiving Green's complaint in October 1998, the bar contacted Respondent by letter asking him to communicate with Green and to report back to the bar. Respondent testified that he spoke with Green but failed to contact him in writing as requested by the bar. Green denied Respondent communicated with him in any manner.

---

any recommendations made upon completion of such assessment;

c) That Respondent shall have no further disciplinary action initiated against him during the probationary period and, in the event such action was taken, the General Counsel's Office would immediately notify the Oklahoma Supreme Court of Respondent's violation of the terms and conditions of his probation; and

d) That Respondent will continue to seek regular counseling for his depression from his minister and medical doctor.

**4**

Respondent acknowledged that he did not report back to the bar.

¶ 12 In December 1998 the bar sent Respondent a letter advising that Green's grievance had been opened for formal investigation and he was required to respond within 20 days. Respondent did not respond as required. The bar then sent Respondent a followup letter in January 1999, which was returned undelivered. In February 1999, the bar association's investigator spoke with Respondent and hand delivered the Green complaint to Respondent with directions to respond to Green and the bar by March 16th. Again, no response was forthcoming. Respondent finally contacted the bar on March 18th, asking for an extension due to his mother's illness and then failed to comply with the extension granted. The bar association then issued a Subpoena Duces Tecum in April 1999.

¶ 13 When Respondent produced a response in conjunction with his April deposition, he attempted to justify his inaction by denigrating the strength of Green's case. He also argued that although Green's action had been dismissed, Green suffered no prejudice because it was dismissed without prejudice and Green was still able to refile.

¶ 14 During the deposition (April 1999), Respondent agreed to furnish the bar with the contingency fee contract or agreement with Green. The bar also reminded Respondent of the responses due in the Davis, Gee, and Henderson grievances. Respondent assured the bar he had already prepared those responses and would send them the following day. Respondent failed to provide either the contingency fee agreement or the responses to any of the other complaints.

¶ 15 At his hearing before the Tribunal a year later, Respondent explained that he suffered short term memory loss so severe during his vitamin deficiency illness that he must not have remembered his promises to the investigators and bar counsel or the directives of the bar association. Counsel for the bar acknowledged that after Respondent began seeking medical treatment for the B-12 deficiency and hired counsel to represent him in the bar matters, he followed through on each of the bar association's requests for information and responses in a prompt fashion.

¶ 16 Both parties stipulated that Respondent's neglect of Green's case and his failure to respond to the bar concerning the Green grievance violated the following provisions of the Rules of Professional Conduct (RPC), 5 O.S.1991 Ch. 1, App. 3–A, and Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 1991 Ch. 1, App. 1 A: Rules 1.3 (diligence), 1.4 (communication with client), 8.1(b) (failure to respond to lawful demand for information from bar association), 8.4(a) (violate or attempt to violate RPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the RPC and Rules 1.3 (acts contrary to prescribed standards of conduct), 5.2 (compliance with bar investigations) of the RGDP.

## II. The Davis Complaint

¶ 17 Ms. Jadie Davis (Davis) retained Respondent in 1994 to handle her wrongful termination and breach of contract claim against her former employer. Davis experienced great difficulty reaching Respondent during the next two years. Although Respondent did file a Petition on Davis' behalf in 1996, Davis subsequently became dissatisfied with Respondent's lack of communication and failure to act on her case. She sent Respondent a letter terminating him and instructing him to withdraw as counsel from her case. Respondent failed to respond to her instructions. After repeated unsuccessful attempts to have Respondent withdraw and return her file materials, Davis filed a bar grievance against Respondent in October 1998.

¶ 18 In a pattern substantially similar to the Green Complaint, Respondent failed to contact the bar association as it investigated Davis' grievance, eventually forcing the bar to issue another subpoena. Respondent appeared, albeit late, for his deposition on May 25, 1999. At this deposition Respondent attempted to excuse his inaction by suggesting that Davis was not committed to the suit. In reviewing the contents of Davis' returned file, the bar association learned that with the exception of the initial Petition, Respondent

had done nothing in the case for two years. Even as late as September of 1999, Respondent still had not withdrawn as Davis' counsel despite the fact he had been repeatedly directed to do so.

¶ 19 The parties stipulated that Respondent conduct with regard the neglect of Davis' case violated Rules 1.3 (diligence), 1.4 (communication with client), 1.16 (requiring an attorney to withdraw his representation if unable to effectively represent client), 8.1(b) (failure to respond to lawful demand for information from bar association), 8.4(a) (violate or attempt to violate RPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the RPC and Rules 1.3 (acts contrary to prescribed standards of conduct), 5.2 (compliance with bar investigations) of the RGDP.

### III. Gee Complaint

¶ 20 In 1998 Mr. Jeffrey Gee (Gee) retained Respondent to represent him in a suit against his employer. According to Gee, Respondent promised to review tape recordings and other materials and try to file a suit in federal court. Gee also said he and Respondent verbally agreed to split equally any proceeds of the case. Respondent denied that he was retained by Gee and asserted that he only agreed to evaluate the case.

¶ 21 With the exception of a few isolated occasions, Gee was unable to reach Respondent, despite repeated attempts during 1998 and 1999. Gee finally spoke with Respondent in January of 1999 after waiting the entire day at this office. When Respondent failed to follow up on his assurances at the January meeting, Gee sent him a certified letter and facsimile terminating his services and requesting the return of his file. Although Respondent's office received the certified letter, he did not return the file. After repeated unsuccessful attempts to retrieve his file, Gee filed a grievance with the bar association in February 1999.

¶ 22 Respondent again ignored repeated requests for information from the bar association, just as he had done in Green and Davis, necessitating a deposition in May 1999. At the deposition, Respondent said he had returned the majority of the file to Gee.

When the bar association's investigator contacted the Gees, Mrs. Gee told him that Respondent had returned only one document, a memo Gee had written to the Respondent. However, Respondent indicated he had later found a tape recording and several items which had been misfiled. He left these newly located items with the bar to return to Gee. Contrary to Respondent's contention that he found only a few items, in fact, these misfiled items comprised virtually the entire Gee file; Respondent had not previously returned the file to the Gees as he claimed. Although Respondent said he had reviewed the file and done an evaluation, the investigator was unable to find any work product performed by Respondent in the file.

¶ 23 Respondent promised the bar a timeline relating to the events which occurred in Gee's case, as well as other information in response to Gee's grievance. Respondent failed to provide the bar with any of the requested material.

¶ 24 The parties stipulated that Respondent's conduct with regard the neglect of Gee's case violated Rules 1.3 (diligence), 1.4 (communication with client), 1.15 (safekeeping property), 1.16 (requiring an attorney to withdraw his representation if unable to effectively represent client), 3.3 (candor toward the tribunal), 8.1(b) (failure to respond to lawful demand for information from bar association), 8.4(a) (violate or attempt to violate RPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the RPC and Rules 1.3 (acts contrary to prescribed standards of conduct), 5.2 (compliance with bar investigations) of the RGDP.

### IV. Henderson Complaint

¶ 25 Ms. Patricia Henderson was a family friend of attorney Kermit Jones, a former partner of Respondent. Mr. Jones recommended Respondent to Henderson to handle an insurance claim, wrongful death suit and the probate of two estates. Henderson testified that Kermit Jones paid Respondent a $2500.00 retainer on her behalf for these matters. Respondent claimed the money reimbursed him for services already performed for Jones, unrelated to Henderson's affairs.

Mr. Jones indicated the money was payment to Respondent for previous work on unrelated matters, as well as an initial retainer for Henderson's cases.

¶ 26 Respondent did little work on Henderson's cases. He appeared at a hearing to appoint the personal representative of the estates, but failed to do anything else of significance in any of the other cases.[2] Respondent was also entrusted with photos and negatives of an accident scene which were taken shortly after the incident. The negatives had important evidentiary value, because the scene was substantially altered after the accident. Respondent lost the photos and negatives.

¶ 27 While representing Henderson, Respondent received three separate checks for medical payments and other accidental death benefits relating to one of the trusts in his charge. When Henderson subsequently retained new counsel, the attorney had great difficulty getting Respondent to turn over the file and the checks. Although there is no allegation that Respondent improperly appropriated the funds for himself, he failed to inform Henderson that he had received the checks and failed to timely forward them to her new counsel when his services were terminated. In addition, Medicare and several insurance companies told Henderson they were unable to make contact with Respondent regarding the claims.

¶ 28 Respondent routinely failed to respond to the bar association during the course of the Henderson investigation.

¶ 29 The parties stipulated that Respondent's conduct with regard the neglect of Henderson's grievance violated Rules 1.3 (diligence), 1.4 (communication with client), 1.15 (safekeeping property), 3.2 (expedite litigation), 8.1(b) (failure to respond to lawful demand for information from bar association), 8.4(a) (violate or attempt to violate RPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the RPC and Rules 1.3 (acts contrary to prescribed standards of conduct), 5.2 (compliance with bar investigations) of the RGDP.

### V. Haragan Complaint

¶ 30 The bar added the Haragan Complaint as Count V in an amended Complaint. Respondent entered into a contingency fee contract to represent Mr. Haragan and Mr. Houston in a wrongful termination claim against the City of Waurika. In 1998 the parties reached a settlement in which the city consented to a tax roll judgment for payment of $10,000.00. Respondent failed to register the judgment on the tax rolls. Although Respondent received in excess of $30,000.00 for his services in this case, he failed to respond to repeated requests on the part of Haragan and Houston to place their judgment on the tax rolls.

¶ 31 To assist Respondent, a friend of his prepared the consent decrees and releases necessary for filing the judgment with the city. Respondent failed to exert even the minimal effort required to file the instruments until much later, making Haragan and Houston ineligible for payment of their 1998 judgment until 2001.

¶ 32 Haragan filed a grievance with the bar association in September 1999. Although Respondent was notified of the complaint, he failed to respond to the bar until he was compelled to testify.

¶ 33 The parties stipulated that Respondent's conduct with regard the neglect of Haragan and Houston's case violated Rules 1.3 (diligence), 1.4 (communication with client), 1.16(a)(2) (declining to terminate representation when attorney's physical or mental condition materially impairs his ability to represent client), 3.2 (expedite litigation), 8.1(b) (failure to respond to lawful demand for information from bar association), 8.4(a) (violate or attempt to violate RPC) of the RPC and Rules 1.3 (acts contrary to prescribed standards of conduct), 5.2 (compliance with bar investigations) of the RGDP.

### VI. Mitigation

¶ 34 The parties stipulated that mitigating circumstances operated in favor of Respon-

---

2. Respondent claimed to have interviewed prospective witnesses, although Henderson and Mr. Jones were unaware of any such work.

dent receiving some lesser form of discipline than suspension. Some of these factors include the absence of any previous discipline during Respondent's seventeen year practice as an attorney; depressive symptomatlogy, stemming in part from serious illnesses and death in Respondent's family; and the temporary loss of his legal assistant during a critical period. However, the factor that mitigates most significantly in Respondent's favor is the vitamin deficiency illness which impaired Respondent's memory, in addition to causing general weakness and fatigue. The medical evidence reveals that Respondent's misconduct and the office management problems he experienced resulted directly from the memory loss produced by a severe vitamin B–12 deficiency. Respondent is now on a regimen of B–12 shots for the remainder of his life. Once he began treatment his short term memory improved to normal levels and his weakness and fatigue subsided. The bar association noticed profound improvement in its dealings with Respondent, once the physical illness was diagnosed and treatment began. Respondent's illness is the single strongest mitigating factor preventing this Court from imposing more severe discipline.

¶ 35 Mitigating circumstances may be considered in evaluating an attorney's conduct and assessing the appropriate discipline. *State ex rel. Oklahoma Bar Ass'n v. Taylor,* 2000 OK 35, ¶ 33, 4 P.3d 1242, 1255. An attorney's lack of willful misconduct, especially when a debilitating illness is remedied, may serve as mitigation due to the Court's focus on "a practitioner's present condition and its future consequences" and not exclusively on the past conduct. *Donnelly,* 848 P.2d at 546–47. This does not mean an attorney's disability will shield him from professional responsibility. *Id.* at 547.

### VII. Discipline

¶ 36 This Court possesses original and exclusive jurisdiction in bar disciplinary proceedings. Rule 1.1 RGDP. This Court's review is by de novo consideration of the entire record. *State ex rel. Oklahoma Bar Ass'n v. Weeks,* 1998 OK 83, ¶ 12, 969 P.2d 347, 351. The Tribunal's findings, conclusions

of law, or recommendations of discipline are not binding on this Court. *State ex rel. Oklahoma Bar Ass'n v. Eakin,* 1995 OK 106, 914 P.2d 644, 648. "The ultimate responsibility to impose discipline in a case before this court is ours alone." *Id.*

¶ 37 This Court's primary function is to protect the public and determine an attorney's continued fitness to practice law, not to punish. *State ex rel. Oklahoma Bar Ass'n v. Donnelly,* 1992 OK 164, 848 P.2d 543, 546; *State ex rel. Oklahoma Bar Ass'n v. Mayes,* 1999 OK 9, 977 P.2d 1073, 1082; *See also State ex rel. Oklahoma Bar Ass'n v. Denton,* 1979 OK 116, 598 P.2d 663; *State ex rel. Oklahoma Bar Ass'n v. Hall,* 1977 OK 117, 567 P.2d 975; *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* 1991 OK 88, 824 P.2d 1090, 1101; *State ex rel. Oklahoma Bar Ass'n v. Colston,* 1989 OK 74, 777 P.2d 920. Discipline serves this goal due to its deterrent factor, both with regard to the subject attorney and demonstrating to the bar as a whole the Court's expectations of professional legal practice. *Donnelly,* 848 P.2d at 547; *Mayes,* 977 P.2d at 1081–82.

¶ 38 Both the bar association and Tribunal recommended discipline in the form of a reprimand. Each was convinced that the combined effect of Respondent's B–12 deficiency illness and depression were so physically and emotionally disabling that they prevented him from effectively representing his clients. The Tribunal specifically found "[t]he conduct of Respondent lacks the critical element which would warrant severe discipline, that of *willfulness.* There was *no* voluntary conduct on Respondent's part which caused the acts alleged." (emphasis in original). We agree. It is clear that once Respondent was hospitalized, diagnosed with severe B–12 deficiency and began taking B–12 injections, he no longer experienced the short term memory losses and he fully complied with all the requests of the bar association.

¶ 39 Although the bar association did not affirmatively pursue Respondent's disciplinary proceeding under a Rule 10 (Personal Incapacity to Practice Law) procedure, the Tribunal and bar clearly were swayed by the same considerations and analysis that define a Rule 10 proceeding. *Donnelly,* 848 P.2d at

546 (a lawyer's incapacity to practice may be considered in a Rule 6 disciplinary proceedings). As a result, the Respondent's lack of willful and conscious neglect, combined with his apparent capacity to practice law at present, are factors warranting lesser discipline than suspension.

¶ 40 Although the Tribunal has recommended a private reprimand, in our view the circumstances of this case warrant a public censure. It is important that all members of the bar understand that while a disabling medical condition may in some instances mitigate misconduct, the illness may not excuse the attorney's failure to terminate his services or seek assistance when his legal performance falls below the required standard of competent representation.

¶ 41 The record clearly indicates Respondent knew that at some point his ability to represent clients was significantly compromised. Between 1996 and 1998, Respondent received countless phone calls in which these clients complained of his failure to attend to their cases. He also received faxes and letters voicing the same complaints. Respondent failed to take any meaningful corrective action in response to his escalating inability to represent his clients.[3] He failed to implement a reminder system to help him remember to contact his clients. In addition, he failed to hire temporary support staff when his legal assistant was taken away for a family emergency. If taking this corrective action was beyond Respondent's physical and emotional resources, he should have either sought the assistance of outside counsel or terminated his services and allowed his clients to seek other counsel.

¶ 42 Two other factors also compel this Court to impose a public censure. First, in our view Respondent demonstrated a lack of candor with the Tribunal over the issue of whether he returned Gee's file. Second, in an effort to excuse his own client neglect, Respondent attempted to denigrate his client's claim or his client's commitment to prosecuting the claim in both the Green and Davis cases. It is clearly not Respondent's role as attorney to pass judgment on either one of these issues and lay idle while his client's case is compromised. If Respondent's view of the case or his client's commitment to it prevented him from providing adequate representation, Respondent should have advised them to seek other counsel.

### VIII. Conclusion

¶ 43 For the reasons set out in this opinion, Respondent receives a public censure with probation of one year and conditions set out in the parties' stipulations, as modified in accordance with ¶ 5 of this opinion. As stipulated by the parties, Respondent is to pay the costs of the investigation and disciplinary proceedings in the amount of $1218.11 within ninety (90) days of the effective date of this opinion, pursuant to Rule 6.16 of the RGDP. Respondent's probation will begin on the effective date of this opinion and expire at the end of one year.

RESPONDENT PUBLICLY CENSURED AND ORDERED TO PAY COSTS.

¶ 44 SUMMERS, C.J., HARGRAVE, V.C.J. and LAVENDER, KAUGER, WATT, and WINCHESTER, JJ. concur.

¶ 45 HODGES, J., with whom OPALA, J. joins, concurring in part and dissenting in part:

I would impose a more severe discipline.

---

3. Respondent did reduce his caseload in 1997 in an effort to gain control of his workload.